**AFFIRM; and Opinion Filed July 15, 2024**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-22-01346-CR

### SANTHOSH KUMAR RATHODE, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the County Criminal Court No. 3**
**Dallas County, Texas**
**Trial Court Cause No. MA1922298C**

## MEMORANDUM OPINION

Before Justices Goldstein, Smith, and Garcia
Opinion by Justice Smith

Santhosh Kumar Rathode appeals his conviction for driving while intoxicated.

*See* TEX. PEN. CODE. ANN. 49.04(a), (d).  In three issues, he asserts the trial court

reversibly erred by admitting the results of his intoxilyzer breath test and a 9-1-1 call

recording into evidence and by denying his right to a speedy trial.  We affirm.

## Background

On February 9, 2019, appellant was arrested for driving while intoxicated

(DWI) with an alcohol-concentration level of 0.15 or more.  He was released on

bond and subsequently charged by complaint with the offense. After a number of resets, his case was tried to a jury in November 2022.

Ailene Stanley testified that she was a program coordinator and records custodian for a consolidated 9-1-1 call center for the cities of Farmers Branch, Carrollton, and Coppell. According to Stanley, a CD offered into evidence by the State contained an exact duplicate of a 9-1-1 call recording made at the center on February 9, 2019. Stanley identified Michael Law, the dispatcher recorded on the call, as a former employee who had been working around 2:00 a.m. on that date. The trial court admitted the recording into evidence, and it was published to the jury. The recording reflects that Kyandra Fox called 9-1-1 and described encountering a man passed out in a black sedan at the intersection of Alpha Road and Midway in Farmers Branch. Fox reported that the sedan's engine was running and she had been unable to awaken the man, who she described as a black or mixed male of medium height in his twenties.

Farmers Branch Police Officer Jonathan Marett testified that he was on duty February 9, 2019, and, around 2:00 a.m., was dispatched to 13600 Midway Road for a welfare check. There, he observed a black Mustang parked almost in the intersection. A woman was talking to a man, later identified as appellant, in the Mustang's driver's seat. When Officer Marett approached, appellant pressed the gas pedal, so Officer Marett and another officer removed appellant from the vehicle. Appellant was not wearing a shirt, appeared to have just awakened, and smelled of

–2–

alcohol. Appellant also was slurring his words and unsteady on his feet. Officer Marett attempted to administer a horizontal gaze nystagmus test, but appellant was unable to follow his instructions. Officer Marett's dashcam and bodycam both recorded video of the encounter, and the recordings were admitted into evidence and published to the jury.

Officer Marett testified that he took appellant into custody and arrested him for DWI. An empty vodka bottle and a shirt stained with vomit were located during an inventory of appellant's vehicle.

At the jail, Officer Marett took appellant into the intoxilyzer room, and appellant agreed to provide a breath specimen. Before taking the specimen, Officer Marett confirmed that appellant's mouth was empty and commenced a fifteen-minute waiting period. He explained that the purpose of the waiting period was to make sure there was nothing, including residual alcohol, in a subject's mouth "that would mess up the test when they start to blow." Appellant burped after a few minutes, and Officer Marett started a new fifteen-minute waiting period. Appellant subsequently provided two breath specimens, and the intoxilyzer machine generated a report. Officer Marett testified that the machine was working when he used it. He also testified that appellant vomited after the breath test was administered.

Officer Marett read appellant his Miranda warnings, and appellant agreed to speak with Officer Marett. Appellant stated that he should not be driving and responded "seven" when asked how intoxicated he was on a scale from zero to ten.

–3–

Alvin Finkel testified that he was an area supervisor at the Southwestern Institute of Forensic Scientists (SWIFS), a fee-for-service laboratory. He was responsible for teaching operators how to use intoxilyzer machines. Finkel testified that officers are trained to restart the fifteen-minute waiting period if they observe a test subject regurgitate, but not for a belch or a burp.

Finkel also maintained and inspected intoxilyzers and was familiar with the intoxilyzer used in this case. It was certified on February 9, 2019, and in Finkel's opinion was operating correctly at that time and capable of giving valid test results. Finkel testified that the results of appellant's two tests, as shown on the analytical report generated by the intoxilyzer, were 0.157 and 0.162 grams of alcohol per 210 liters of breath. It was Finkel's opinion that an individual with an alcohol concentration of .08 grams or greater of alcohol would have lost the normal use of the mental and physical faculties required to safely operate a motor vehicle.

After hearing the evidence and the arguments of counsel, the jury returned a guilty verdict. Appellant elected to have the trial court assess punishment. At the punishment hearing, he testified that he was in the United States on a temporary work visa, and his wife was seven-months pregnant. Although the case had been set for trial many times, he had always come to court and done everything that he was supposed to do. His counsel stated, and appellant agreed, that he did not want a conviction because of the impact that it would have on his immigration and he wanted time to consider whether to appeal.

The trial court sentenced appellant to 120 days' confinement in county jail, suspended that sentence, and imposed community supervision for a period of twelve months. This appeal followed.

**Evidentiary Rulings**

In two issues, appellant complains that the trial court committed reversible error in admitting his breath test results and the 9-1-1 call recording into evidence. A trial court has considerable latitude with regard to evidentiary rulings, and we review those rulings for an abuse of discretion. *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018); *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). Under this deferential standard, we uphold a trial court's decision if it is within the zone of reasonable disagreement and correct under any theory of law applicable to the case. *Fowler*, 544 S.W.3d at 848; *Winegarner*, 235 S.W.3d at 790.

*1. Breath Test Results*

In his first issue, appellant contends that the trial court erred by admitting his breath test results. Appellant asserts that there was evidence that the fifteen-minute observation period was "compromised and substance entered into appellant's mouth," indicating that Officer Marett failed to comply with Texas Department of Public Safety (DPS) guidelines for administering the test.

Evidence of alcohol concentration shown by analysis of a breath specimen is admissible in a DWI prosecution, provided the specimen is taken and analyzed under DPS rules by a DPS-certified test operator. TEX. TRANSP. CODE ANN. §§ 724.016,

724.064.  When such evidence is offered, the trial court must determine whether the test operator properly applied the required technique in accordance with DPS rules on the occasion in question.  *Reynolds v. State*, 204 S.W.3d 386, 390–91 (Tex. Crim. App. 2006).

A test operator, among other required techniques, must "remain in the continuous presence of the subject at least 15 minutes immediately before the test and should exercise reasonable care to ensure that the subject does not place any substances in the mouth."  37 TEX. ADMIN. CODE § 19.3(a)(1) (2015) (Tex. Dep't Pub. Safety, Breath Alcohol Testing Regulations).  Direct observation, however, is not necessary to ensure the accuracy of the test result.  *Id.*; *Alvarez v. State*, 571 S.W.3d 435, 437–38 (Tex. App.—Fort Worth 2019, pet. ref'd).

Officer Marett's interactions with appellant in the intoxilyzer room were recorded on video, and the recording was admitted into evidence and published at trial.  He testified that he was a DPS-certified intoxilyzer operator when he administered appellant's test.  He determined that appellant had nothing in his mouth and then started the fifteen minute waiting period.  Appellant burped twice, and Officer Marett restarted the waiting period out of an abundance of caution.  He did not know if appellant had actually regurgitated.

Officer Marett acknowledged that he did not look directly at appellant for the entire waiting period, but he was not required to do so.  37 TEX. ADMIN. CODE § 19.3(a)(1).  Defense counsel played a portion of the video recording and asked

–6–

Officer Marett if appellant appeared to burp. Officer Marett testified that it sounded like a grunt; he did not agree that appellant burped or belched.

Officer Marett's testimony and the video recording demonstrate that he complied with the DPS requirement that he remain in appellant's continuous presence for at least fifteen minutes immediately before the test and exercise reasonable care to ensure that appellant did not place any substances in his mouth. *See id.* On this record, we conclude that the trial court did not abuse its discretion in admitting appellant's breath test results into evidence. We overrule appellant's first issue.

### 2. *9-1-1 Call Recording*

In his third issue, appellant contends that the trial court erred in admitting the 9-1-1 call recording into evidence over his predicate, hearsay, and Confrontation Clause objections.

#### A. Authentication

Appellant first asserts that admission of the 9-1-1 call recording was an abuse of discretion because neither individual on the call was present at trial to testify that the "recording was accurate and that the people who were purported to be on the recording were in fact actually on the call."

To authenticate an item of evidence, including sound recordings, the proponent must produce evidence sufficient to support a finding that the item in question is what the proponent claims it to be. TEX. R. EVID. 901(a). There need

not be conclusive proof of authenticity in order for a trial court to admit disputed evidence. *Fowler*, 544 S.W.3d at 848; *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012) ("the trial court itself need not be persuaded that the proffered evidence is authentic"). The trial court need only decide "whether the proponent of the evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence he has proffered is authentic." *Tienda*, 358 S.W.3d at 638. This is a "liberal standard of admissibility." *Fowler*, 544 S.W.3d at 849 (quoting *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015)).

A proponent may authenticate evidence multiple ways, including by direct testimony from a witness with personal knowledge. *Tienda*, 358 S.W.3d at 638; *Montoya v. State*, 43 S.W.3d 568, 570–71 (Tex. App.—Waco 2001, no pet.) (9-1-1 tape properly authenticated and admissible when custodian testified that tape was made in ordinary course of business at or near time of event recorded). To authenticate an audio recording, a witness need not identify every speaker on the recording. *Jones v. State*, 80 S.W.3d 686, 688–89 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

Here, Stanley testified that she was the records custodian for the call center, where they received 9-1-1 calls for Farmers Branch and dispatched the appropriate response. She further testified that the 9-1-1 call recording was an exact duplicate of the 9-1-1 recording made on February 9, 2019, that she listened to it prior to trial and "signed off on it," that it was the regular course of business for the call center to

–8–

keep records like the recording, and that it fairly and accurately represented what happened that night. Stanley also was familiar with Law, the dispatcher on the recording. We conclude, like the trial court, that her testimony was sufficient to support a reasonable jury determination that the 9-1-1 call recording was authentic. *See, e.g.*, *Washington v. State*, No. 01-18-00596-CR, 2019 WL 3786558, at *2–3 (Tex. App.—Houston [1st Dist.] Aug. 13, 2019, pet. ref'd) (mem. op., not designated for publication) (custodian of records properly authenticated 9-1-1 call recording when she identified the CD that contained the recording and testified that she had reviewed the call on the CD, placed her initials on the CD, recognized the voice of the 9-1-1 call taker, and the recording was a record kept in the ordinary course of the City's business and was made at or near the time of the events recorded on the CD); *Esnard v. State*, No. 05-02-01812-CR, 2003 WL 22332395, at *2 (Tex. App.—Dallas Oct. 14, 2003, no pet.) (not designated for publication) (9-1-1 call authenticated through business records).

## B. Hearsay and Confrontation Clause Violation

Appellant also asserts that the trial court erred in overruling his hearsay and Confrontation Clause objections to admission of the 9-1-1 call recording.

Hearsay is a statement, other than one made by the declarant while testifying at trial, offered into evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Generally, hearsay statements are inadmissible at trial. TEX. R. EVID. 802. The Sixth Amendment Confrontation Clause prohibits admission of testimonial

statements by a witness who did not appear at trial unless the witness was unavailable to testify and the defendant had a prior opportunity for cross examination. *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004); *Allison v. State*, 666 S.W.3d 750, 762 (Tex. Crim. App. 2023). Statements that are properly offered and admitted not to prove the truth of the matter, but rather for a non-hearsay purpose, do not implicate confrontation clause rights and are admissible under *Crawford. See Del Carmen Hernandez v. State*, 273 S.W.3d 685, 688–89 (Tex. Crim. App. 2008) (because co-defendant's statement to police was offered and admitted as non-hearsay to impeach co-defendant's credibility, and not to prove the truth of the matter, it did not implicate appellant's confrontation rights).

The trial court admitted the 9-1-1 call recording over appellant's hearsay and Confrontation Clause objections. Although the record does not reflect that either party requested a limiting instruction, the trial court provided the following instruction after a subsequent break during Officer Marett's testimony:

> THE COURT: Be seated. Members of the jury, I'm going to give you some instruction for the 911 call. Opening statements are not evidence, they're just summaries because the prosecutors and lawyers cannot testify unless they're sworn in, alright? And so I'm going to give you a limiting instruction to then, you heard the 911 call that the State put on. And the purpose that you should consider that evidence for, is whether or not that 911 call was made. The statements made by the person making the 911 call were not offered for the truth of the matter asserting, right? So we don't know if what that person was saying about whatever she was seeing is true or not. That – That's not why it was admitted. It was admitted to show that, in fact, a 911 call was made, and that is what you should consider that portion of the evidence was

–10–

for and nothing else. Is that clear? Okay. Very well. Call back your witness.

Appellant did not object to the court's instruction.

The trial court made clear that it admitted the 9-1-1 call recording not to prove that the recorded statements were the truth of the matter, but for the non-hearsay purpose of explaining that the 9-1-1 call preceded the police response to the intersection of Alpha and Midway Roads. Accordingly, the statements on the recording were nonhearsay and did not implicate appellant's Confrontation Clause rights. *See, e.g.*, *West v. State*, 406 S.W.3d 748, 764–65 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (9-1-1 call properly admitted over hearsay and Confrontation Clause objections when it was offered not for truth of what 9-1-1 caller stated, but instead to provide basis for police response); *Kimball v. State*, 24 S.W.3d 555, 564–65 (Tex. App.—Waco 2000, no pet.) (officer's testimony on out-of-court conversations between officer and dispatcher regarding conversation between unknown motorist and 9-1-1 operator regarding possible DWI was non-hearsay, and its admission did not violate confrontation clause). The trial court, acting in accordance with Texas Rule of Evidence 105, provided an instruction limiting the recording's admissibility, and we presume that the jury followed the instruction. *See* TEX. R. EVID. 105(a); *Lacaze v. State*, 346 S.W.3d 113, 121 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). On this record, we cannot conclude that the trial court abused its discretion in admitting the recording as nonhearsay.

–11–

Even had the statements on the recording been hearsay, we would conclude that they were admissible under the hearsay exception for present sense impressions. TEX. R. EVID. 803(1). A present sense impression is a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." *Id.* The underlying rationale for the exception is that "contemporaneity of the statement with the event that it describes eliminates all danger of faulty memory and virtually all danger of insincerity." *Fischer v. State*, 252 S.W.3d 375, 380 (Tex. Crim. App. 2008).

Here, the evidence shows that Fox related to the 9-1-1 operator the events immediately preceding her call and the events contemporaneously transpiring thereafter. Because the statements concerned the events as they were happening, and as Fox was perceiving them, the trial court could have reasonably determined the statements fell within the hearsay exception of present sense impression. *See, e.g.*, *Kinnett v. State*, 623 S.W.3d 876, 911 (Tex. App.—Houston [1st Dist.] 2020, pet ref'd) (concluding 9-1-1 recording was admissible under present sense exception because caller described what he observed right before and immediately after the car accident); *see also Reyes v. State*, 314 S.W.3d 74, 79 (Tex. App.—San Antonio 2010, no pet.) (concluding 9-1-1 call described events as they were happening and qualified as present sense impression exception). Accordingly, admission of the recording over appellant's hearsay objection would not have been an abuse of discretion.

Likewise, admission of the recording would not have violated appellant's confrontation rights. Whether a statement is testimonial is a constitutional legal question that we review de novo. *Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010); *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006); *Chronister v. State*, No. 05-15-00038-CR, 2016 WL 3517951, at *3 (Tex. App.— Dallas June 20, 2016, pet. ref'd) (mem. op., not designated for publication) (citing *Wall*). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Vinson v. State*, 252 S.W.3d 336, 338 (Tex. Crim. App. 2008) (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)). In contrast, statements are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* (quoting *Davis*, 547 U.S. at 822). Factors to determine whether a statement was made during an ongoing emergency include whether: (1) the situation was still in progress; (2) the questions sought to determine what was presently happening as opposed to what had happened in the past; (3) the primary purpose of the interrogation was to render aid rather than to memorialize a possible crime; (4) the questioning was conducted in a separate room, away from an alleged attacker; and (5) the events were deliberately recounted in a step-by-step fashion. *Id.* at 339.

–13–

Statements on 9-1-1 calls that relate to ongoing emergencies, and do not establish historical facts, are non-testimonial and do not implicate the Sixth Amendment. *Davis*, 547 U.S. at 827–28 (statements made by complainant to 9-1-1 dispatcher identifying Davis as her assailant were non-testimonial because their "primary purpose was to enable police assistance to meet an ongoing emergency"); *Gaeta v. State*, No. 05-14-01202-CR, 2016 WL 3870665, at *5 (Tex. App.—Dallas July 12, 2016, no pet.) (mem. op., not designated for publication) (statements made during 9-1-1 call related to an ongoing emergency and were non-testimonial). In this case, Fox alerted the 9-1-1 dispatcher that a man was passed out in a vehicle with the engine running at an intersection. The dispatcher's questions sought to determine what was presently happening at the location and to direct responding officers to the scene. We conclude the statements related to an ongoing emergency and were nontestimonial in nature. Accordingly, admitting the recording over appellant's Confrontation Clause objection would not be an abuse of discretion.

For these reasons, we overrule appellant's third issue.

**Speedy Trial**

In his second issue, appellant argues that the State violated his constitutional right to a speedy trial. The Sixth Amendment to the U.S. Constitution guarantees the accused in a criminal prosecution the right to a speedy trial. *See* U.S. CONST. amend. VI. The right attaches once a person is either arrested or charged. *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008). We determine a speedy trial

claim on an ad hoc basis by analyzing and weighing four factors: (1) the length of the delay, (2) the State's reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant because of the length of delay. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *Cantu*, 253 S.W.3d at 280. The State has the burden to justify the length of the delay, while the defendant has the burden to prove that he asserted his right and was prejudiced by the State's delay. *Cantu*, 253 S.W.3d at 280.

A trial court need not conduct a formal or specially designated hearing on a motion for speedy trial. *Taylor v. State*, 667 S.W.3d 809, 810 (Tex. Crim. App. 2023). The record is sufficient for an appellate court to weigh the *Barker* factors if it contains information on "the length of the delay, reason for the delay, assertion of the right, and prejudice." *Id.* When the record fails to show whether and what type of prejudice the appellant may have suffered, the deficiency merely affects how the factors will be weighed. *Id.*

We apply a bifurcated standard of review in a speedy trial analysis: we employ an abuse of discretion standard for the factual components and a de novo standard for the legal components. *State v. Lopez*, 631 S.W.3d 107, 113–14 (Tex. Crim. App. 2021). We give almost total deference to the trial court's historical findings of fact that are supported by the record. *Gonzales v. State*, 435 S.W.3d 801, 808 (Tex. Crim. App. 2014). Initial triggering of the speedy trial issue, as well as the balancing test of the *Barker* factors, are purely legal questions that we review de novo. *Id.*

–15–

*1. Presumptive Prejudice and Length of Delay*

To trigger a speedy trial analysis, the defendant must make an initial showing that "the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Id.* (quoting *Doggett v. United States*, 505 U.S. 647, 651–52 (1992)); *see also Barker*, 407 U.S. at 530–32 (length of delay is "triggering mechanism" for analysis of other factors). Although Texas courts generally have considered delay approaching one year to be "unreasonable enough to trigger the *Barker* enquiry," *see Balderas v. State*, 517 S.W.3d 756, 768 (Tex. Crim. App. 2016), we determine whether a *Barker* analysis is triggered on a case-by-case basis, without imposing rigid time limitations. *Munoz v. State*, Nos. 05-20-00192-CR, 05-20-00194-CR, 2021 WL 2253245, at *6 (Tex. App.—Dallas June 3, 2021, pet. ref'd) (mem. op., not designated for publication).

Appellant was arrested on February 9, 2019; his right to a speedy trial attached on that date. *See Cantu*, 253 S.W.3d at 280 (right attaches once a person becomes an "accused" by being arrested or charged). His trial began November 29, 2022, almost three years and ten months later. However, when addressing the length of delay, we do not include time covered by agreed resets. *Mosley v. State*, No. 05-22-00121-CR, 2023 WL 5163278, at *4 (Tex. App.—Dallas Aug. 11, 2023, pet. ref'd) (mem. op., not designated for publication). Here, the record contains eighteen pass

slips signed by appellant's counsel showing he agreed to resets from the initial July 30, 2019 trial setting through the November 29, 2022 trial.[1]

The docket sheet, however, contains notations indicating that a reset from September 13, 2021 to December 6, 2021 was a "court reset" and a subsequent reset to February 28, 2022 was a "State reset." Appellant filed his speedy trial demand on February 14, 2022, after his counsel signed a January 27, 2022 pass slip resetting

---

[1] Specifically, the record contains the following pass slips:

- July 30, 2019 pass slip for reset to September 10, 2019, signed by both parties and indicating reason for reset was discovery;
- September 10, 2019 pass slip for reset to October 15, 2019, signed by both parties with notations "will rec" and "requested obstruction review";
- October 15, 2019 pass slip for reset to November 19, 2019, signed by both parties with notation "declined obstruction/will rec";
- November 18, 2019 pass slip for reset to January 13, 2020, signed by both parties and noting a plea offer;
- January 13, 2020 pass slip for reset to February 17, 2020, signed by both parties;
- February 17, 2020 pass slip for reset to May 20, 2020, signed by both parties and noting that pretrial was set on May 7, 2020;
- April 29, 2020 pass slip for reset to July 20, 2020, signed by defense counsel with notation "set for trial";
- July 13, 2020 pass slip for reset to September 21, 2020, signed by defense counsel with notation "needs trial date";
- September 14, 2020 pass slip for reset to October 26, 2020, signed by defense counsel with notation "needs trial date";
- October 19, 2020 pass slip for reset to December 14, 2020, signed by defense counsel with notation "need trial date";
- December 7, 2020 pass slip for reset to February 8, 2021, signed by defense counsel with notation "need trial date";
- February 1, 2021 pass slip for reset to March 8, 2021, signed by defense counsel with notation "need trial date;"
- March 1, 2021 pass slip for reset to April 26, 2021, signed by defense counsel with notation "need trial date";
- April 19, 2021 pass slip for reset to September 14, 2021, signed by both parties with notation "PTH 9/2/21";
- May 24, 2021 pass slip for reset to September 13, 2021, signed by both parties;
- September 14, 2021 pass slip for reset to December 6, 2021, signed by both parties;
- November 29, 2021 pass slip for reset to February 28, 2022, signed by both parties;
- January 27, 2022 pass slip for reset to August 15, 2022, signed by both parties with notation that pretrial was set for July 13, 2022; and
- July 29, 2022 pass slip for reset to November 29, 2022, signed by both parties.

trial to August 15, 2022. Appellant did not request a hearing on his speedy trial demand. The trial court held a pretrial hearing on July 13, 2022, but there is no reporter's record of that hearing to indicate if appellant's speedy trial demand was discussed. Then, on July 29, 2022, the State filed its first motion for continuance, requesting additional time "to secure the attendance of a key and material witness." The motion states that appellant opposed the continuance. The record does not indicate that there was a hearing on the motion. The docket sheet reflects only that the court granted the motion, noting, "State has a witness that is unavailable; case to be tried or dismissed," and reset trial for November 29, 2022.

Discounting the pass slips signed by appellant's counsel that appear to conflict with the docket sheet notations and appellant's opposition to the State's motion for continuance, appellant sought or agreed to reset trial for a period of approximately two years and seven months.[2] The remaining delay, attributable to the State, was a period of approximately one year and three months.[3] We consider the overall delay in bringing appellant to trial sufficient to trigger a *Barker* analysis. We also consider the length of delay attributable to the State, slightly over a year, to weigh against it, but not heavily.

---

[2] We note that, for a portion of this period, there were delays in jury trials due to the Covid-19 pandemic; during the punishment hearing, appellant's counsel acknowledged that the case had "certainly dragged on . . . because of the circumstances of COVID and the shutdowns."

[3] February 9, 2019 to July 30, 2019 (five months, twenty-two days), September 13, 2021 to February 28, 2022 (five months, sixteen days), and August 15, 2022 to November 29, 2022 (three months, fifteen days).

–18–

## 2. *Reasons for the Delay*

Under the second *Barker* factor, we weigh the reasons for the delay in bringing appellant to trial. 407 U.S. at 530. Deliberate delays by the State, intended to "hamper the defense," weigh heavily against it. *Balderas*, 517 S.W.3d at 768. Neutral reasons for the delay, such as negligence or overcrowded courts, also weigh against the State, but not as heavily. *Id.* Valid reasons for the delay, such as a missing witness or engaging in plea negotiations, are justified and do not weigh against the State. *Barker*, 407 U.S. at 531; *State v. Munoz*, 991 S.W.2d 818, 824 (Tex. Crim. App. 1999). Nor do delays attributable to the defendant. *Id.* The State's failure to offer a reason for the delay weighs against it, but not heavily, because when the record is silent as to the reason for the delay, we presume neither willful conduct by the State nor a valid reason for the delay. *Balderas*, 517 S.W.3d at 768; *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003).

Just under six months of the overall delay occurred between appellant's arrest and the initial July 30, 2019 trial setting. The State, however, is entitled to a reasonable period of time in which to develop its case. *See Shaw v. State*, 117 S.W.3d 883, 889–90 (Tex. Crim. App. 2003) (noting that three-month interval between indictment and first setting was reasonable period for preparation and did not count against State). There is no evidence that this period of time was unreasonable or the result of any deliberate attempt by the State to delay. Accordingly, we conclude that this period is neutral. *See Chairez v. State*, Nos. 05-

22-00967-CR–05-22-00986-CR, 2023 WL 9693573, at *5 (Tex. App.—Dallas Dec. 6, 2023, pet. ref'd) (mem. op., not designated for publication).

An additional delay of approximately five and a half months was due to the December 6, 2021 "court reset" and the February 28, 2022 "State reset." We weigh neutral reasons, such as negligence and overcrowded courts, against the State, *Balderas*, 517 S.W.3d at 768, but there is no explanation in the record for either reset, both of which occurred prior to appellant filing his speedy trial demand. Because appellant does not contend that the State engaged in bad faith conduct, and nothing in the record suggests as much, we weigh these delays against the State, but not heavily so.

The final three and a half month delay was due to the State's motion for continuance, which was filed after appellant filed his speedy trial demand. The State sought the motion in order to secure a witness for trial, and a missing witness can be a valid reason justifying an appropriate delay. *Barker*, 407 U.S. at 531. Neither the State's motion nor anything else in the record identify the witness that was unavailable, why the witness was necessary, or the State's efforts to procure the witness's attendance at trial, but there is no argument that the State deliberately delayed appellant's trial for strategic gain. Because this lack of an explanation is not as egregious as purposeful delaying tactics, we conclude that this factor weighs only slightly against the State.

### 3. *Assertion of the Right*

In determining whether a defendant was deprived of his speedy trial right, we give strong evidentiary weight to his assertion of the right. *Balderas*, 517 S.W.3d at 771. The longer the delay before trial, the more likely a defendant wanting a speedy trial would request it. *Id.* If the defendant does not timely demand a speedy trial, we assume that he did not really want one. *Id.* A tardy assertion of the right to a speedy trial does not waive the right, but makes it more difficult to show the right was denied. *Richardson*, 631 S.W.3d at 277.

Here, appellant did not file his speedy trial demand until February 14, 2022, more than three years after his arrest. At the time, trial was set for August 15, 2022, a reset agreed to by appellant's counsel in a January 27, 2022 pass slip. Although the State thereafter obtained an additional three and a half month continuance, appellant acquiesced to the vast majority of the prior delay.

A defendant must timely assert his right to a speedy trial; it weighs against a speedy-trial challenge when he fails to do so. *See Balderas*, 517 S.W.3d at 771. On this record, we conclude that appellant's extended delay in demanding a speedy trial, coupled with his agreement to at least fifteen resets, weighs heavily against a finding of a speedy-trial violation. *See Shaw*, 117 S.W.3d at 890 (in view of lengthy delay, during most of which appellant quietly acquiesced, assertion of right factor weighed very heavily against finding violation of right to speedy trial); *Dragoo*, 96 S.W.3d at 314–15.

–21–

## 4. *Prejudice Caused by Delay*

To assess the prejudice, if any, caused by the delay, we consider the interests that the speedy trial right attempts to protect: preventing oppressive pretrial incarceration, minimizing anxiety and concerns of the accused, and limiting the possibility that the defense will be impaired. *Munoz*, 991 S.W.2d at 826.

Appellant was not subject to pretrial incarceration. To show prejudice, he directs the Court to his expression of concern, during the punishment hearing, about the effect that a conviction may have on his immigration status. However, he directs us to nothing to show that the delay in resolving this case affected his immigration status. Further, evidence of a generalized concern or anxiety, though relevant, is not sufficient proof of prejudice under the *Barker* test. *See Cantu*, 253 S.W.3d at 286.

Appellant also asserts that "the fact that the original 9-1-1 caller as well as the 9-1-1 dispatcher were not called to trial hindered [his] ability to effectively investigate and defend his case as well as cross-examine witnesses." He directs the Court to nothing in the record to identify what he had done to try to locate either potential witness or what they might have testified to on his behalf. *See Harris v. State*, 489 S.W.2d 303, 308 (Tex. Crim. App. 1973) (to show prejudice, defendant must show witnesses are unavailable, their testimony might be material and relevant to his case, and he has exercised due diligence in attempt to find them and produce them for trial). Indeed, his acquiescence to the majority of the extended delay may have played a role in the witnesses' availability. *See State v. Gilliland*, No. 05-16-

–22–

00547-CR, 2017 WL 3276004, at *7 (Tex. App.—Dallas Aug. 1, 2017, pet. ref'd) (mem. op., not designated for publication).  Accordingly, we conclude that appellant has failed to establish a level of prejudice sufficient to meet the fourth *Barker* factor, and this factor weighs against him.

5. *Balancing the* Barker *Factors*

Having assigned weight to the four *Barker* factors, we balance their relative weights in light of the conduct of both parties.  *Cantu*, 253 S.W.3d at 281.  Weighing the relevant factors together in a de novo balancing analysis, we conclude that appellant failed to establish a violation of the right to a speedy trial.  The length of the one year, three month delay attributed to the State weighs against it slightly.  Appellant asserted his right to a speedy trial, but did so approximately three years after his arrest and after agreeing to a number of resets, and he has not shown that the State's delay in trying him caused him prejudice.  We overrule appellant's second issue.

**Conclusion**

We affirm the trial court's judgment.

/Craig Smith/
CRAIG SMITH
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
221346F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

SANTHOSH KUMAR RATHODE,
Appellant

No. 05-22-01346-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Criminal
Court No. 3, Dallas County, Texas
Trial Court Cause No. MA1922298C.
Opinion delivered by Justice Smith.
Justices Goldstein and Garcia
participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

Judgment entered this 15th day of July, 2024.